## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DWAYNE EDWARD WETZEL, | CASE NO. 3:13-cv-02955-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 7, 8,9, 10 |

## MEMORANDUM

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Dwayne Edward Wetzel ("Plaintiff") for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff filed the present application in December of 2010, shortly after being diagnosed with multiple sclerosis ("MS"), although Plaintiff had been exhibiting symptoms of MS since as early as June of 2007. Plaintiff claimed that his MS symptoms and treatment caused him fatigue and pain that would preclude him from working a full eight-hour workday. However, the ALJ concluded that Plaintiff's MS did not cause any additional limitations whatsoever beyond those caused by his other physical impairments,

which included a seizure disorder and obesity. The ALJ found that Plaintiff could perform light work on a regular and continuing basis, eight hours a day, five days a week.

In June of 2007, Plaintiff began experiencing one of the most characteristic MS symptoms, namely, worsening of neurological functioning with increased heat, as he suffered a seizure at work on one particularly hot day. After Plaintiff lost his job, his symptoms improved and he remained seizure-free with normal gait, reflexes, strength, and sensation through 2008. However, by early 2009, Plaintiff began reporting steady weight gain, tearfulness, tiredness, and achiness. Fatigue, pain, and mental status changes are also symptoms of MS. In mid-2009, Plaintiff had another exacerbation during heat, when he had a non-seizure-related fall while mowing his lawn. He began experiencing vision problems, an indication of MS, for which he unsuccessfully underwent surgery in December of 2009. In early 2010, Plaintiff began exhibiting increased reflexes, and in November of 2010, he reported jerking in his legs. Both are characteristic of MS.

In December of 2010, an MRI of the brain indicated lesions that were most consistent with MS, and Plaintiff began interferon therapy. Through 2011, Plaintiff continued exhibiting increased reflexes and also exhibited decreased sensation, a positive Babinski test, gait dysfunction, depression, and anxiety. He underwent physical therapy for gait dysfunction secondary to multiple sclerosis and began

psychiatric treatment for his declining mental health condition. Physical therapy notes indicate that Plaintiff could only walk for seven to fifteen minutes at a time and psychiatric progress notes indicate that Plaintiff's global assessment of functioning ("GAF") remained at or below 50, in the severe range. On mental status examinations, Plaintiff was generally disheveled; with psychomotor retardation or agitation; restricted and flat affect; dysthymic, angry, and irritable mood; and impaired cognition, judgment, insight, and concentration. He was diagnosed at a consultative examination with borderline intellectual ability. Plaintiff reported that his interferon shots made him fatigued and sore for up to three days and that he needed frequent naps throughout the day.

The administrative law judge ("ALJ") was required to give Plaintiff's claims of MS-related fatigue serious consideration, and rejected them without adequate explanation. The ALJ relied on Plaintiff's purportedly normal physical examinations, but fails to mention multiple objective abnormalities documented on examination. Moreover, even normal physical examinations would not contradict his claims of fatigue and pain. The ALJ also mischaracterizes Plaintiff's gait as normal and fails to mention that he attended physical therapy to correct his gait. Thus, the ALJ was not entitled to rely on an alleged lack of objective findings.

The ALJ notes that Plaintiff's seizure disorder and mental impairments were stable, but this is unrelated to his MS symptoms and treatment. The ALJ also

incorrectly characterizes Plaintiff's mental impairments as stable with normal mental status examination. Thus, the ALJ was not entitled to rely on the stability of Plaintiff's seizure disorder and mental impairments to reject his claims of MS-related fatigue. Similarly, the ALJ notes that Plaintiff's mental health treatment has been conservative, but Plaintiff's conservative mental health treatment does not contradict his claims of MS-related fatigue.

A state agency physician who neither treated nor examined Plaintiff concluded that he could perform light work for a full eight-hour workday. However, this physician mischaracterized Plaintiff's gait as normal and erroneously concluded that he did not attend physical therapy. The physician also mischaracterized the record as documenting a limitation from cold environments, instead of hot environments. The physician's opinion does not mention Plaintiff's claims of fatigue from his MS medication.

Under the substantial evidence standard of review, the Court will affirm conclusions by the ALJ where a reasonable mind could accept the relevant as adequate to deny benefits. However, a single piece of evidence is not sufficiently substantial when it is overwhelmed by other evidence. Moreover, the ALJ is required to acknowledge and address contradictory evidence to allow the Court to meaningfully review the ALJ decision. Here, the ALJ failed to acknowledge significant contradictory evidence of Plaintiff's gait dysfunction and other

symptoms of his impairments and did not provide an explanation for dismissing Plaintiff's claimed medication side effects. This precludes meaningful review by the Court. The Court cannot determine whether substantial evidence supports the ALJ's denial of benefits. Specifically, the Court cannot determine whether substantial evidence supports the ALJ's conclusion that Plaintiff could stand or walk for six hours out of an eight-hour work day and that Plaintiff could regularly attend work, eight-hours a day, five days a week. For the foregoing reasons, the Court will grant Plaintiff's appeal, vacate the decision of the Commissioner, and remand for further proceedings.

## II.    Procedural Background

On December 28, 2010, Plaintiff filed an application for DIB and SSI under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act").  (Tr. 84-99). On August 22, 2011, the Bureau of Disability Determination denied these applications (Tr. 60-69), and Plaintiff filed a request for a hearing on September 27, 2011.  (Tr. 72-73). On May 1, 2012, an ALJ held a hearing at which Plaintiff— who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 28-49).   On June 27, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-27). On August 31, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals denied on October 23, 2013, thereby affirming the decision of the ALJ as the "final decision"

of the Commissioner. (Tr. 1-6).

On December 9, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On March 4, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On April 18, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 9). On May 21, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 10). On July 7, 2014, the parties consented to transfer of this case to the undersigned for adjudication. (Doc. 14).  The matter is now ripe for review.

## II.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y*

*of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. §

1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that

he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a

person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also*

*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds

that a Plaintiff is disabled or not disabled at any point in the sequence, review does

not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## IV. Relevant Facts in the Record

Plaintiff was born on December 3, 1970, and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 32). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a corrugator operator. (Tr. 20, 32).

Plaintiff began suffering seizures in 1992 and came under the care of Dr. John B. Chawluk, M.D. (Tr. 154, 240, 422). On August 24, 2006, Plaintiff followed-up with Dr. Chawluk. (Tr. 163). Plaintiff was being treated for seizures with Zonegran and Dilantin. (Tr. 163). His physical examination was normal. (Tr. 163). Plaintiff reported having a seizure a few weeks earlier "due to sleep deprivation caused by overtime demands at his job," but was otherwise "doing well." (Tr. 163). He had "no problems" adjusting to Zonegram as an addition to Dilantin. (Tr. 163). His physical examination was normal. (Tr. 163). Plaintiff's Zonegram was increased and he was limited to working no more than forty hours per week. (Tr. 163). Plaintiff followed-up with Dr. Chawluk approximately every six months. (Tr. 163-67, 207-223). On January 4, 2007, Plaintiff remained seizure free with normal physical examinations, although he reported issues with obesity and sleep apnea. *Id.*

On June 19, 2007, Plaintiff reported having a seizure while at work at a factory that was not air-conditioned.[1] (Tr. 165). He was instructed to remain

_____

[1] "[P]articularly characteristic [of MS]…[is] the Uhthoff phenomenon (transient worsening of symptoms and signs when core body temperature increases, such as after exercise or a hot bath)." Compston A, Coles A. *Multiple sclerosis*. Lancet. 2008;372:1502–1517. "An estimated 60–80% of MS patients experience temporary worsening of clinical signs and neurological symptoms with heat exposure… Fatigue during thermal stress is common in MS and results in decreased motor function and increased symptomatology likely due to impairments in central conduction." Davis, Scott L. et al. "Thermoregulation in Multiple

hydrated "in the extreme heat environment he [was] exposed to." (Tr. 165). On May 16, 2008, Plaintiff reported that he had lost his job. (Tr. 167). However, Plaintiff reported "feeling much better" because he had less stress. (Tr. 167).

On January 13, 2009, Plaintiff established care with Dr. Matthew Kraynak, D.O., a primary care provider. (Tr. 303). Plaintiff reported steady weight gain and indicated that he followed with Dr. Chawluk for his seizure disorder. (Tr. 303). Dr. Kraynak also noted diagnosis of depression and chronic bronchitis. (Tr. 303).

On February 9, 2009, Plaintiff reported to Dr. Chawluk that his seizures remained stable on Dilantin and Zonegram, but was "complaining of episodes of tearfulness as well as tiredness and aching."[2] (Tr. 223). On June 17, 2009, Plaintiff "remain[ed] stable" with regard to seizures. (Tr. 221). However, he "had an episode…where he became overheated while cutting grass in a very large lawn" and "fell over and chipped his tooth." (Tr. 221). Dr. Chawluk indicated this was "not seizure-related." (Tr. 221).

In September of 2009, Plaintiff was seen at the Eye Care Center complaining of difficulty focusing his eyes.[3] (Tr. 348). He had less than full range of motion in

---

Sclerosis." *Journal of Applied Physiology* 109.5 (2010): 1531–1537. *PMC*. Web. 30 Apr. 2015.

[2] "The most frequent disabilities caused by MS are muscle weakness…pain…and mental status changes including depression." 14-182 Attorneys Textbook of Medicine (Third Edition) § 182.07.

[3] Symptoms of MS include optic neuritis, which is "[l]oss of vision affecting usually one eye and evolving over hours or days," and diplopia, which is "[d]ouble

both eyes. (Tr. 348). On December 3, 2009, Plaintiff followed-up with Dr. Kraynak for a medical clearance for an upcoming eye surgery. (Tr. 306). On December 9, 2009, Plaintiff had strabismus surgery to correct a lazy eye. (Tr. 348-56).

On January 5, 2010, Plaintiff followed-up with Dr. Chawluk. (Tr. 222). Plaintiff had a "new physical finding" of increased reflexes in his knees and ankles,[4] so Dr. Chawluk ordered an MRI of his brain and cervical spine. (Tr. 222). "From a seizure standpoint he [was] doing well" with "one small seizure." (Tr. 222). His seizure medications were continued. (Tr. 222). On April 20, 2010, Plaintiff again had increased reflexes. (Tr. 220). He also reported a "sharp stabbing pain" in his head. (Tr. 220).

On June 2, 2010, Plaintiff followed-up with Dr. Neeraj Dubey, M.D., a neurologist in Dr. Chawluk's office. (Tr. 219). He reported having a breakthrough seizure with tongue biting the previous Saturday due to extreme heat and dehydration. (Tr. 219). They discussed changing his seizure medication, but Plaintiff indicated the cost was too high. (Tr. 219). On October 19, 2010, Plaintiff

---

vision… common in MS…caused by disconjugate eye movements." -87 Attorneys Textbook of Medicine (Third Edition) § 87.30.
[4] "Signs and symptoms typical of multiple sclerosis include… hyperreflexia (excessively active reflexes), and Babinski reflex (extension of the big toe and fanning or flexion of the other toes upon stroking of the sole of the foot)." 4-M Attorneys' Dictionary of Medicine M-78840.

reported that he had no further seizures, but had been "excessively tired."[5] (Tr. 218).

On October 5, 2010, Plaintiff's first application for DIB was denied after a hearing before an ALJ. (Tr. 116).

On November 11, 2010, Plaintiff followed-up with Dr. Chawluk "with a new complaint." (Tr. 213). Dr. Chawluk noted that Plaintiff "contacted [them] recently stating he was having jerking in his legs"[6] and had "been having some nocturnal urinary incontinence." (Tr. 213). On examination, Plaintiff had increased reflexes in the upper and lower extremities. (Tr. 213). His sensation was absent or diminished in his feet. (Tr. 213). Dr. Chawluk ordered imaging studies. (Tr. 213). On November 22, 2010, an EMG and nerve conduction study was abnormal, with mild bilateral sensorimotor polyneuropathy. (Tr. 214). An MRI of his cervical spine indicated a disc protrusion and a disc herniation without nerve root or cord compression. (Tr. 212). An MRI of the brain indicated "three non-enhancing small subcortical white matter lesions…Demyelinating disease is not entirely eliminated." (Tr. 212). Dr. Chawluk ordered additional studies. (Tr. 212).

---

[5] "Individuals with multiple sclerosis characteristically tire during physical and cognitive tasks, and take longer to recover: although poorly understood, and probably multifactorial, fatigue in multiple sclerosis can be very disabling, even in isolation." Compston A, Coles A. *Multiple sclerosis*. Lancet. 2008;372:1502–1517.
[6] "The most frequent disabilities caused by MS [include] muscle…spasticity." 14-182 Attorneys Textbook of Medicine (Third Edition) § 182.07. "Spastic gait is frequently caused by vascular disease (e.g., stroke and multiple sclerosis)." 14-180 Attorneys Textbook of Medicine (Third Edition) P 180.30.

On November 15, 2010, an MRI of Plaintiff's cervical spine indicated no interval change since January of 2010. (Tr. 477). Plaintiff had a "small" disc protrusion with "mild effacement of the thecal sac without any substantial foraminal canal or nerve root compression," a "small" disc herniation "without nerve root compression or spinal cord compression," and "mildly prominent degenerative changes of uncovertebral hypertrophy and facet joint hypertrophy." (Tr. 477).

On December 1, 2010, Dr. Chawluk indicated that Plaintiff's testing was "most consistent with [multiple sclerosis]." (Tr. 211). Plaintiff was "very open to therapy." (Tr. 211). Dr. Chawluk provided information about standard medications for multiple sclerosis ("MS"), and Plaintiff indicated that he would begin one once he determined what his insurance would cost. (Tr. 211).

On January 12, 2011, Plaintiff completed a Function Report. (Tr. 131). He reported taking multiple naps for several hours throughout the day and indicated his illnesses, injuries and conditions make him "sleep a lot." (Tr. 131-32). He reported no problem with personal care. (Tr. 132). He indicated that he cooks, but performs no other house or yard work because he "sleep[s] most of the time." (Tr. 134). He reported shopping once a week for ninety minutes with his girlfriend. (Tr. 134). He indicated that he watches television and uses a computer, but "watch[es] less tv because [he] sleep[s] more." (Tr. 135). He reported that he had problems

walking and sitting and could only walk for "two or three blocks" before needing to rest. (Tr. 136). He reported being fired due to an "issue with [a] fellow co-worker," along with anxiety and depression. (Tr. 137). He reported that his medications caused side effects of sleepiness and weight gain. (Tr. 142).

On January 21, 2011, Dr. Kraynak submitted an opinion letter to the state agency. (Tr. 230). He wrote:

> Mr. Wetzel suffers with seizure disorder and epilepsy. He has a history of obstructive sleep apnea, obesity, chronic bronchitis. He has a history of depression, which causes forgetfulness, sleep difficulties and poor concentration. He has right hand, right wrist and right shoulder problems. He has a limited ability to drive. He is followed by a neurologist. He has EMG evidence of bilateral sensorimotor polyneuropathy in the lower extremities.
>
> Given his current state and lack of ability to drive, I believe that Mr. Wetzel would have difficulty finding employment.

(Tr. 230).

On March 9, 2011, Plaintiff followed-up with Dr. Chawluk. (Tr. 236). Plaintiff reported that he had "at least one seizure since his last visit" and that his "stress load is increasing." (Tr. 236). Plaintiff had increased reflexes in his upper extremities and ankles. (Tr. 236). Plaintiff's Effexor and Zonegram were increased,

and his Dilantin was continued. (Tr. 236). Plaintiff had been taking Avonex[7] for

MS for about three months, which was "working out well for him." (Tr. 236).

On May 20, 2011, Plaintiff had a psychiatric evaluation at Newton

Psychiatric Clinic. (Tr. 240). He reported feeling down, hopeless, and worthless

with no energy and poor sleep.[8] (Tr. 240). He reported that he occasionally drank

alcohol to excess and was advised to stop drinking alcohol altogether. (Tr. 241).

On examination, he was "disheveled" and "morbidly obese." (Tr. 242). His speech

was "delayed" and his mood was dysthymic, anxious, and irritable. (Tr. 242). His

cognition, insight, judgment, and attention and concentration were impaired. (Tr.

242). He was diagnosed with major depressive disorder, recurrent, moderate, and

anxiety disorder, not otherwise specified. (Tr. 242). He was assessed to have a

global assessment of functioning ("GAF") score of 65, with a highest score in the

past year of 70. (Tr. 242).

On June 9, 2011, Plaintiff followed-up with Dr. Chawluk. (Tr. 247). Plaintiff

reported panic attacks, and indicated that his psychiatrist was prescribing him

---

[7] Avonex is the "trademark name of a preparation of interferon beta used in treatment of relapsing multiple sclerosis." 1-A Attorneys' Dictionary of Medicine A-13412.

[8] "Depression, possibly severe, can be a side effect of [interferon] treatment." 8-48 Attorneys Textbook of Medicine (Third Edition) P 48.90. "People with multiple sclerosis also have a greater risk of suicide, reflecting an increased lifetime frequency of depression of up to 50%, in some studies, which is either a manifestation of cerebral inflammation or, more probably, a response to the uncertainties and restrictions that are imposed by a progressive disabling illness." Compston A, Coles A. *Multiple sclerosis*. Lancet. 2008;372:1502–1517.

Effexor and Clonazepam. (Tr. 247). Plaintiff reported that he had eye surgery the previous year and felt that his "eye [was] continuing to go out." (Tr. 247). On examination, he was moderate-severely obese, had decreased sensation in his knees and ankles, positive Babinski[9] test, and "mild difficulty with tandem gait." (Tr. 247). Dr. Chawluk "told him to make sure that he stays hydrated during the summer months for his MS and also for possible anhidrosis from the Zonegram." (Tr. 247). Dr. Chawluk also emphasized that Plaintiff needed to follow with Dr. Kraynak for blood sugar, "since he does have evidence for diabetic neuropathy on examination, and his diabetes and obesity are most likely leading to his muscular pain and sense of being 'physically out of shape.'" (Tr. 247). Dr. Chawluk also "set up physical therapy for his leg weakness and gait unsteadiness[10] secondary to his multiple sclerosis." (Tr. 248).

On June 15, 2011, Plaintiff had a physical therapy evaluation. (Tr. 481). Plaintiff's diagnoses were "gait dysfunction" and MS. (Tr. 481). Plaintiff reported "leg soreness for a few days after minimal activity." (Tr. 481). Plaintiff had become more inactive and gained weight over the previous months. (Tr. 481). He was concerned about his leg pain, "decreased strength, and poor endurance." (Tr.

---

[9] *Supra* note 4.

[10] "The most frequent disabilities caused by MS [include]… difficulty walking." 14-182 Attorneys Textbook of Medicine (Third Edition) § 182.07. "Discoordinated movements of the limbs or gait are common in MS and can be caused by plaques affecting the cerebellar afferent or efferent pathways."4-180 Attorneys Textbook of Medicine (Third Edition) P 180.30.

481). He reported that he could not go up and down the stairs in his home, complete yard work, or mow the lawn. (Tr. 481). Plaintiff also reported loss of functional strength, loss of postural strength, and that he required "frequent rest breaks." (Tr. 481). Plaintiff had decreased strength. (Tr. 481).

On June 16, 2011, Plaintiff had a consultative examination with state agency psychologist Dr. Sue Labar Yohey, M.Ed. (Tr. 250). Plaintiff reported a suicide attempt after his mother died and his wife left him. (Tr. 252). He also reported being in "anger management counseling at one time. He was told that he would instigate things at work." (Tr. 252). On examination, Plaintiff's gait was slow and his affect was sad. (Tr. 253). Plaintiff had "trouble with the proverbs presented to him" during testing. (Tr. 253). Plaintiff reported that he takes turns cleaning with his girlfriend and has to take breaks because he sweats. (Tr. 253). He reported low energy, poor sleep, and needing "to be pushed to do things." (Tr. 253). He indicated that he was comfortable in the store and could walk all the aisles in the grocery store. (Tr. 254). He reported that he does simple repairs around the house, but does not do yard work because he gets overheated. (Tr. 254). Dr. Yohey recommended intelligence testing and concluded that "[a]lthough [Plaintiff] has had some problems with depression in the past, he is not currently displaying any symptoms of depression." (Tr. 256). She suggested that mental health diagnosis

should be deferred. (Tr. 256). She opined that Plaintiff had slight problems in all work related activities. (Tr. 259).

On June 20, 2011, Plaintiff followed up at Newton Psychiatric Clinic. (Tr. 440). He reported continued symptoms of depression and his GAF[11] was dropped to 48. (Tr. 440). On examination, he was disheveled with a dysthymic mood and restricted affect. (Tr. 440). His attention and cognition were impaired and his insight and judgment were fair. (Tr. 440). His medications were continued. (Tr. 440).

Plaintiff attended eleven physical therapy sessions from June 20, 2011 to his reevaluation on July 14, 2011. (Tr. 484-94). Plaintiff demonstrated "slow" progress and improvement in his symptoms and functions. (Tr. 490-91). As of July 14, 2011, he had met his first set of short term goals. (Tr. 494). Specifically, he could ambulate for fifteen minutes without pain or fatigue in his lower extremities. (Tr. 494). Plaintiff attended six more sessions before his next reassessment on July 29,

---

[11] "The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994).... A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.*"*Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) (citing *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994).

2011. On July 26, 2011, Plaintiff demonstrated "improved strength." (Tr. 499). At his July 29, 2011, reassessment, Plaintiff reported "getting stronger." (Tr. 501). He could "ambulate 7 minutes" and "go up 7 stairs before needing to rest." (Tr. 501). He was unable to go shopping or climb a full flight of stairs without lower extremity weakness and pain. (Tr. 501). Objectively, Plaintiff had decreased strength and his score on the Dynamic Gait Index was "indicative of increased risk to fall." (Tr. 501). Notes indicate that "curbs remain difficult due to a combination of decreased [lower extremity] control and balance." (Tr. 502). His therapists added balance activities and scheduled him for another three weeks of therapy. (Tr. 504). Plaintiff attended his appointment on August 1, 2011. (Tr. 503). However, he had to cancel his appointments on August 3, 2011 and August 5, 2011 due to transportation problems after his truck broke down. (Tr. 504-05). Plaintiff was discharged from physical therapy when he was unable to return. (Tr. 506).

On August 7, 2011, Plaintiff followed up with Dr. Yohey for intelligence testing. (Tr. 263). Testing indicated that Plaintiff functioned in the borderline intellectual range. (Tr. 264). Dr. Yohey opined that Plaintiff had slight limitations in handling simple instructions and interacting with others. (Tr. 267). She opined that Plaintiff had moderate limitations in handling detailed instructions, making judgments on simple work-related decisions, and responding appropriately to work pressures or changes in the work setting. (Tr. 267).

At follow-ups at Newton Psychiatric Clinic in July, August, and October of 2011, Plaintiff's GAF was assessed at either a 45 or a 50. (Tr. 444). He continued to exhibit a disheveled appearance, psychomotor retardation or agitation, dysthymic and irritable mood, restricted, flat affect, and impaired insight or attention. (Tr. 441-43).

On August 18, 2011, state agency psychologist Dr. John Chiampi, Ph.D., reviewed Plaintiff's file and issued an opinion. (Tr. 269). He opined that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace; and one or two episodes of decompensation of extended duration. (Tr. 279). He opined Plaintiff was markedly limited in his ability to handle detailed instructions and moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instruction and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behaviors extremes; respond appropriately

to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 282-83). Dr. Chiampi cited Plaintiff's GAF scores of "65/70" and his ability to engage in personal care and shop. (Tr. 281). He concluded that Plaintiff could meet the "basic mental demands of competitive work on a sustained basis." (Tr. 285).

On August 19, 2011, state agency physician Dr. Mark Bohn, M.D., reviewed Plaintiff's file and issued an opinion. (Tr. 300). He opined that Plaintiff could occasionally lift and carry up to twenty pounds and frequently lift and carry up to ten pounds. (Tr. 297). He opined that Plaintiff could stand or walk for six hours out of an eight-hour workday and sit for six hours out of an eight-hour workday. (Tr. 297). He opined that Plaintiff was limited in pushing and pulling in the lower extremities due to decreased sensation in both feet. (Tr. 297). He opined that Plaintiff could never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, crouch, and crawl, and could frequently balance, stoop, and kneel. (Tr. 298). He opined that Plaintiff had no manipulative, communicative, or visual limitations. (Tr. 298-99). He opined that Plaintiff should avoid concentrated exposure to cold, but had no limitation in being exposed to heat. (Tr. 299). He explained that he had reviewed notes from Plaintiff's primary care physician, psychologist, neurologist, and hospital reports through August 7, 2011. (Tr. 301).

Dr. Bohn concluded that Plaintiff's treatment had been routine and conservative in part because he "does not attend physical therapy." (Tr. 301). Dr. Bohn did not mention Plaintiff's allegations of side effects from medication. (Tr. 301). He concluded that Plaintiff's "gait/station/motor/deep tendon reflex/straight leg raising/edema/pulses [were] good." (Tr. 301).

On September 8, 2011, Plaintiff completed a Disability Appeals Report. (Tr. 155). He reported that his condition has worsened because "when he take[s] the Avonex shot for [his] MS, [he] get[s] a headache, joint and muscle aches, fevers and can't function for a couple of days." (Tr. 149). He explained that his fatigue "slows [him] down" and "Dr. Chawluk sent [him] to physical therapy to try to strengthen [his] legs to help with the fatigue." (Tr. 153). He also reported "a lot of fatigue and muscle spasm and pain." (Tr. 149). He indicated that his immune system was "low because of the shots for [his] MS." (Tr. 149). Plaintiff reported that the medications he took for his other impairments did not cause side effects. (Tr. 152).

On November 11, 2011, Plaintiff followed-up with Dr. Chawluk. (Tr. 360). He had lost weight and was "ambulating better than he was in June," but "had to stop his physical therapy because of transportation issues." (Tr. 360). He reported having no seizures. (Tr. 360). "In general he [was] doing well," but had insomnia and jaw tremors, possibly due to coffee intake. (Tr. 360). He also reported

diaphoresis,[12] or excessive sweating. (Tr. 360). On December 14, 2011, Plaintiff reported increased fatigue and muscle weakness to Dr. Kraynak. (Tr. 439).

On December 16, 2011, Plaintiff followed-up at Newton Psychiatric Clinic. (Tr. 444). He reported that his anxiety had been "controlled" and his mood had been "stable." (Tr. 444). Plaintiff's appearance was disheveled and his mood was dysthymic, but his examination was otherwise normal. (Tr. 444).  He was assessed a GAF of 50. (Tr. 444). At a follow-up in January of 2012, Plaintiff reported "doing better" and his examination was normal. (Tr. 445). He indicated that his MS "flares up occasionally" and his GAF remained at 50. (Tr. 445). On February 27, 2012, Plaintiff reported that his MS "flared up recently." (Tr. 446). He also indicated that he was going through a lot of stress. (Tr. 446). On examination, his appearance was disheveled, he exhibited psychomotor retardation, his mood was dysthymic, angry, and irritable, his affect was restricted and flat, and his cognition, insight, judgment, and concentration were impaired. (Tr. 446). He was diagnosed with severe recurrent major depressive disorder and his GAF remained at 50. (Tr. 446). On March 26, 2012, Plaintiff reported psychosocial stressors, racing thoughts, and poor sleep. (Tr. 447). On examination, he was disheveled, exhibited psychomotor retardation, had delayed and soft speech, dysthymic and anxious

---

[12] Diaphoresis is defined as "excessive perspiration." 2-D Attorneys' Dictionary of Medicine D-34784. "[C]ommon effects of interferons include…sweating…" 8-48 Attorneys Textbook of Medicine (Third Edition) P 48.90.

mood, restricted and flat affect, and impaired attention, concentration, and cognition. (Tr. 447). He was assessed a GAF of 45. (Tr. 447).

On May 1, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 28). He testified that, on October 30, 2007, Plaintiff was fired from his job at a cardboard box manufacturing plant. (Tr. 33, 120-21, 137). He testified that, shortly before his diagnosis for MS, he began having episodes where he would break out into a sweat if he tried to do anything and would need to cool off in front of a fan before he could continue. (Tr. 42). He reported that his seizures had decreased since he stopped working because it was a hot environment, but that his MS medication "really, really take[s] a toll on [him]" because it makes him tired and his muscles and joints hurt.[13] (Tr. 40). He indicated that the MS medication causes his joints and muscles to hurt for at "least a day-and a-half, two days." (Tr. 44). He testified that he is tired all the time and his feet and hands fall asleep. (Tr. 44). He indicated that he takes two to three naps a day that last from two to four hours. (Tr. 44).

He testified that he handles his personal care and cooks, but his girlfriend and her daughter handle the remaining household chores and yard work. (Tr. 35). He indicated that he plays games on the computer and watches television, but does not usually leave the house and no longer has any hobbies. (Tr. 36). He testified

---

[13] "[C]ommon effects of interferons include…muscle aching and fatigue."  8-48 Attorneys Textbook of Medicine (Third Edition) P 48.90.

that he climbs three flights of stairs three or four times per day. (Tr. 37). He reported that the heaviest thing he can lift is a bag of dog food. (Tr. 37). He testified that when it is hot, he can stand for fifteen minutes at a time, and when it is cold, he can stand for about thirty minutes at a time. (Tr. 39). When asked how long he could sit, he responded that he does not "usually sit," and was usually laying on a couch or recliner. (Tr. 39). He testified that he could walk for about two blocks before being out of breath and sweating. (Tr. 39).

A vocational expert also appeared and testified. (Tr. 45). The vocational expert testified that, given the ALJ's RFC as described below, there would be other work in the national economy that Plaintiff could perform. (Tr. 47). The VE also testified that if Plaintiff's RFC was reduced to sedentary work with the same nonexertional limitations, there would be other work in the national economy that Plaintiff could perform. (Tr. 47-48). The VE testified that if Plaintiff would need excess breaks during the day, would be off task thirty percent of the time, or would be absent from work more than three times per month, there would be no work Plaintiff could perform. (Tr. 48).

The ALJ issued the decision on June 27, 2012. (Tr. 22). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 30, 2007, the alleged onset date. (Tr. 13). At step two, the ALJ found that Plaintiff's multiple sclerosis, degenerative disc disease/ degenerative joint disease

of the cervical spine, seizure disorder, obesity, neuropathy, depressive disorder, borderline intellectual functioning, and anxiety disorder were medically determinable and severe. (Tr. 14). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 14). The ALJ found that Plaintiff had the RFC to perform light work, with a sit or stand option and:

> [A] bilateral lower extremity push/pull limitation. He is limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. There is a right overhead reach limitation and he must avoid temperature extremes, especially heat, vibration and hazards, including heights and moving machinery. He is, limited to simple routine tasks and low stress as defined as only occasional decision making and only occasional changes in the work setting.

(Tr. 17). At step four, the ALJ found that Plaintiff could not perform his past relevant work. (Tr. 20). At step five, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 21). Consequently, the ALJ determined that Plaintiff was not disabled within the meaning of the Act and not entitled to benefits. (Tr. 22).

## V.    Plaintiff Allegations of Error

### A. Res judicata

Defendant contends that "Plaintiff cannot rely on evidence concerning the period prior to October 6, 2010, since such evidence is not relevant to the period that was adjudicated by the ALJ on the instant claim." (Def. Brief at 5). However, non-contemporaneous evidence can be highly relevant to a period adjudicated by

the ALJ. In fact, the Regulations and case law require the ALJ to consider non-contemporaneous evidence. For instance, the Regulations require the ALJ to evaluate the medical records for at least twelve months prior to an application for SSI, even though benefits for SSI may not be awarded until the month after the application. 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application."); *see also* 20 C.F.R. § 404.1512(d). There is no exception to this requirement in the Regulations for cases with a previously adjudicated claim within twelve months.

Similarly, SSR 83-20 requires the ALJ to consider non-contemporaneous evidence when a claimant alleges disability due to a slowly progressing disease with an onset prior to the earliest available evidence. SSR 83-20; *Newell v. Comm. of Social Security*, 347 F.3d 541, 547 (3d Cir. 2003) ("[E]ven non-contemporaneous records of Newell's liver disease, diabetes, and neuropathy are relevant to the determination of whether their onset occurred by the date Newell alleges. Here, the ALJ failed properly to consider the non-contemporaneous evidence presented by Newell in order to perform a retrospective analysis.") (citing

*Ivy v. Sullivan,* 898 F.2d 1045, 1049 (5th Cir.1990)). Non-contemporaneous evidence also assists an ALJ understand the course of a claimant's impairments. SSR 96-7p ("Apart from the medical signs and laboratory findings, the medical evidence, especially a longitudinal medical record, can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms. Important information about symptoms recorded by medical sources and reported in the medical evidence may include…course over time (e.g., whether worsening, improving, or static)").

Here, the non-contemporaneous evidence significantly relates to the period adjudicated by the ALJ. Several of Plaintiff's MS symptoms arose for the first time during the twelve months prior to the application, such as increased reflexes, leg jerking, urinary incontinence, and decreased sensation. (Tr. 213, 220-22). Although some of these symptoms were exhibited prior to October 6, 2010, they are still relevant to whether Plaintiff's MS is disabling after October 6, 2010. The relevance of Plaintiff's MS symptoms was not apparent until his MS diagnosis. The prior ALJ was unable to fully analyze the early symptoms and findings relevant to MS, and it was incumbent on the present ALJ to do so.  Consequently, Plaintiff can rely on evidence dated prior to October 6, 2010 to demonstrate that the ALJ's decision lacks substantial evidence.

## B. The ALJ's RFC

The ALJ determined that Plaintiff's new diagnosis of MS did not merit any additional limitations in the RFC whatsoever. Plaintiff asserted that his MS and medications caused him to be fatigued and suffer pain that interfered with his ability to work full-time. However, the ALJ concluded that Plaintiff would not need excess breaks, would not be excessively absent, and could work on a regular and continuing basis, eight-hours a day, five days a week. The ALJ acknowledged that an MRI of the brain "confirm[ed] that the claimant has Multiple Sclerosis," but concluded that:

> Despite these findings, examinations findings are pretty normal, noting sensation loss in the knees and ankles in September of 2011. While he had mild difficulty with tandem walking, his gait is normal. The accommodates [sic] made to accommodate the claimant's other physical conditions will also accommodate any symptomatology he experiences secondary to Multiple Sclerosis.

(Tr. 18).

This determination lacks substantial evidence. First, Plaintiff's MS, unlike his other physical conditions, would be reasonably expected to produce his claimed fatigue, pain, and gait problems. Thus, Plaintiff's MS required the ALJ to give serious consideration to his complaints of fatigue, pain, and gait problems. Second, the ALJ erred in relying on Plaintiff's "normal" gait because he omitted medical evidence that Plaintiff walked with an abnormal gait. Third, the ALJ erred in relying on Plaintiff's physical examinations because: (a) the ALJ omitted objective

abnormalities documented on physical examination and (b) Plaintiff's physical examinations do not contradict his complaints of fatigue or medication side effects.

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing  20 C.F.R. § 404.1529(c)).   The Third Circuit has held that:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective

> evidence of the pain itself." *Green,* 749 F.2d at 1071. Where medical
> evidence does support a claimant's complaints of pain, the complaints
> should then be given "great weight" and may not be disregarded
> unless there exists contrary medical evidence. *Carter,* 834 F.2d at 65;
> *Ferguson,* 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). The Regulations provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work…solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c); *see also Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984); *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). With regard to a claimant's treatment, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. Although an ALJ's credibility assessment is entitled to deference, the ALJ may not reject Plaintiff's credibility for the "wrong reasons." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993).

The ALJ erred in relying on Plaintiff's gait. The ALJ concluded that Plaintiff's gait was "normal." (Tr. 18). The ALJ omits the medical evidence that

establishes difficulty walking secondary to MS. (Tr. 17).   On June 9, 2011,

Plaintiff was moderate-severely obese, had decreased sensation in his knees and

ankles, positive Babinski[14] test, and "mild difficulty with tandem gait," so Dr.

Chawluk "set up physical therapy for his leg weakness and gait unsteadiness[15]

secondary to his multiple sclerosis." (Tr. 247- 48). The records from physical

therapy indicate that Plaintiff's diagnoses were "gait dysfunction" and MS. (Tr.

481). Plaintiff reported that he could not go up and down the stairs in his home,

complete yard work, or mow the lawn. (Tr. 481). Plaintiff also reported loss of

functional strength, loss of postural strength, and that he required "frequent rest

breaks." (Tr. 481).  On examination, Plaintiff had decreased strength. (Tr. 481). As

of July 14, 2011, he could ambulate for fifteen minutes without pain or fatigue in

his lower extremities. (Tr. 494). However, on July 26, 2011, he could only

"ambulate 7 minutes" and "go up 7 stairs before needing to rest." (Tr. 501). He

was unable to go shopping or climb a full flight of stairs without lower extremity

weakness and pain. (Tr. 501). Objectively, Plaintiff had decreased strength and his

score on the Dynamic Gait Index was "indicative of increased risk to fall." (Tr.

501). Notes indicate that "curbs remain difficult due to a combination of decreased

---

[14] *Supra* note 4.

[15] "The most frequent disabilities caused by MS [include]… difficulty walking."
14-182 Attorneys Textbook of Medicine (Third Edition) § 182.07. "Discoordinated
movements of the limbs or gait are common in MS and can be caused by plaques
affecting the cerebellar afferent or efferent pathways."4-180 Attorneys Textbook
of Medicine (Third Edition) P 180.30.

[lower extremity] control and balance." (Tr. 502). The ALJ never mentions any of these records. Consequently, the ALJ was not entitled to rely on Plaintiff's gait to conclude that his claims of MS symptoms were not credible.

The ALJ also mischaracterized Plaintiff's testimony regarding his gait. The ALJ wrote that Plaintiff testified he could "sit, stand, and walk." (Tr. 17). The ALJ does not mention that Plaintiff alleged difficulty sitting, standing and walking. (Tr. 17). Plaintiff testified that when it is hot, he can stand for fifteen minutes at a time, and when it is cold, he can stand for about thirty minutes at a time. (Tr. 39). When asked how long he could sit, he responded that he does not "usually sit," and was usually laying on a couch or recliner. (Tr. 39). He testified that he could walk for about two blocks before being out of breath and sweating. (Tr. 39). The ALJ mischaracterized Plaintiff's testimony in writing that he could "sit, stand, and walk" without mentioning the significant limitations in sitting, standing, and walking Plaintiff alleged.

The ALJ also erred in relying on Plaintiff's physical and mental examinations. The ALJ never mentions multiple abnormalities on examination. The ALJ cites only "mild right exophoria in all directions of gaze," "mild weakness of intrinsic hand muscles bilaterally," "sensation loss in the knees and ankles in September of 2011," and "mild difficulty with tandem walking." (Tr. 18). The ALJ does not mention repeated findings that Plaintiff had increased reflexes.

(Tr. 213, 220-22, 236). The ALJ does not mention Plaintiff's positive Babinski test. (Tr. 247). The ALJ does not mention Plaintiff's physical therapy records, and consequently does not mention the findings contained therein that Plaintiff had decreased strength, could only ambulate for seven to fifteen minutes, had an increased risk of fall according to the Dynamic Gait Index, and struggled to navigate curbs due to a combination of decreased lower extremity control and balance.   (Tr. 499-502).   The ALJ does not mention Plaintiff's symptoms of jerking in his legs or nocturnal urinary incontinence. (Tr. 213).   The ALJ does not mention that Plaintiff had repeated episodes of seizures or falling in hot environments. (Tr. 165).

The ALJ wrote that Plaintiff's "mental status examination findings are essentially within normal limits." (Tr. 19). The ALJ does not mention any of the objective findings documented on mental status examination whatsoever. (Tr. 19). Specifically, the medical record indicates that Plaintiff consistently and repeatedly exhibited a disheveled appearance, psychomotor retardation or agitation, dysthymic and irritable mood, restricted, flat affect, and impaired insight or attention with GAF scores between 45 and 50. (Tr. 441-43). The ALJ likely relied on the opinion of the state agency psychiatrist, who did not review Plaintiff's treatment records from Newtown and cited only Plaintiff's GAF of "65/70." *Supra.*

The ALJ acknowledged that Plaintiff testified that Plaintiff's MS medications "can cause him to be tiered [sic] and have muscle and joint pain." (Tr. 17). These are "common effects" of Plaintiff's interferon therapy. 8-48 Attorneys Textbook of Medicine (Third Edition) P 48.90. The ALJ failed to include Plaintiff's claimed limitations from these effects in the RFC. Specifically, the ALJ concluded that Plaintiff would not need excess breaks, would not be excessively absent, and could work on a regular and continuing basis, eight-hours a day, five days a week. (Tr. 18). However, beyond acknowledging Plaintiff's claimed medication side effects, the ALJ does not further evaluate, discuss, or provide an explanation for discrediting these side effects. The ALJ rejected Plaintiff's claimed limitations due to medication side effects for "no reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). This precludes meaningful review.

The ALJ's reliance on Dr. Bohn's opinion does not cure these errors. A state agency opinion can provide substantial evidence to an ALJ's decision. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011). However, as the Third Circuit has explained:

> [O]ur decisions make clear that determination of the existence vel non of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Here, Dr. Bohn's opinion does not "satisfy the substantiality test" because the ALJ "ignores, or fails to resolve, a conflict created by counterveiling evidence." *Id.*

On June 9, 2011, Dr. Chawluk referred Plaintiff to physical therapy for gait unsteadiness secondary to MS. (Tr. 248). This treatment record was available to Dr. Bohn. (Tr. 292) (Medical records from Dr. Chawluk received August 18, 2011). However, Dr. Bohn concluded that Plaintiff's gait was "good" and that he "does not attend physical therapy." (Tr. 301). Dr. Bohn concluded that Plaintiff's reflexes were "good." (Tr. 301). However, multiple treatment records available to Dr. Bohn indicated that Plaintiff had abnormal reflexes. (Tr. 222) (January 5, 2010); (Tr. 220) (April 20, 2010); (Tr. 213) (November 11, 2010); (Tr. 236) (March 9, 2011). Multiple records before Dr. Bohn indicated Plaintiff's sensitivity to heat. (Tr. 165) (Seizure on June 19, 2007 due to extreme heat environment); (Tr. 221) (June 2009 episode that was "not seizure related" where Plaintiff became overheated and fell while mowing the lawn); (Tr. 219) (June 2010 seizure with tongue biting due to extreme heat and dehydration). However, Dr. Bohn concludes that Plaintiff should be limited in cold, but not hot, environments. (Tr. 299). Plaintiff's January 19, 2011 Function Report was available to Dr. Bohn. (Tr. 292). In Plaintiff's Function Report, he indicated that his medications cause fatigue. (Tr.

142). Dr. Bohn does not mention Plaintiff's claimed side effects anywhere in his opinion. (Tr. 299-301). Consequently, unresolved conflicts remain regarding Plaintiff's gait, sensitivity to heat, MS symptoms, and medication side effects.

Given the errors in Dr. Bohn's opinion and Dr. Bohn's failure to address Plaintiff's claimed side effects of MS medications, his opinion, alone, does not provide substantial evidence for the ALJ to reject Plaintiff's claims of MS-related fatigue. The ALJ rejected Plaintiff's claimed limitations due to MS for the "wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993).  Consequently, the ALJ's rejection of Plaintiff's subjective claims lacks substantial evidence.

The Court remands for the ALJ to properly evaluate whether Plaintiff could perform light work on a regular and continuing basis given his MS diagnosis and treatment. Because the Court recommends remand on these grounds, the Court declines to address Plaintiff's other allegations of error.

## VII.    Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because the ALJ failed to properly evaluate whether Plaintiff could perform light work on a regular and continuing basis given his MS diagnosis and treatment. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: July 23, 2015                          *s/Gerald B. Cohn*
                                        _____
                                        GERALD B. COHN
                                        UNITED STATES MAGISTRATE JUDGE